# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00051-CV

**Joachim Strenk, Appellant**

v.

**Jean Swanson Strenk,[1] Appellee**

## FROM THE COUNTY COURT AT LAW NO. 2 OF WILLIAMSON COUNTY
## NO. 99-1062-FC2, HONORABLE ROBERT F. B. (SKIP) MORSE, JUDGE PRESIDING

Joachim Strenk appeals certain conservatorship and possession orders and challenges the property division made in a final decree of divorce. In nine issues, he attacks the trial court's rulings on classification of certain assets and the division of the community estate, evidentiary rulings, the geographic area governing the child's residence, and the visitation schedules governing his possession of the child. We will overrule all nine issues and affirm the judgment of the trial court.

### FACTUAL BACKGROUND

Joachim Strenk and Tyra Jean Swanson (formerly Strenk) were married in April 1998. They have one child, a daughter who was sixteen months old at the time of trial. The couple began experiencing marital difficulties, caused in large part by Strenk's excessive drinking. The couple

---

[1] Appellee's full name as it appears on our docket is Tyra Jean Swanson Strenk. The divorce decree changed her name to Tyra Jean Swanson. We will refer to her as Swanson in this opinion.

received counseling, but when treatment for substance abuse was recommended, Strenk asked for a divorce. Swanson filed in July 1999. The temporary orders address Swanson's concerns for the safety of their daughter while in Strenk's care, concerns fueled by Strenk's alcohol abuse and his acts of physical violence toward Swanson.[2] The parties waived a jury trial, and the case was tried to the court.

Strenk worked for MicroAssist and was best friends with its sole owner and his employer, Sanjay Nasta. In 1999, Strenk paid for a minority interest in MicroAssist using community funds, thus making him MicroAssist's only shareholder other than Nasta. Strenk and Nasta testified that Strenk had acquired the right to purchase the stock prior to the marriage, and that he had, in fact, purchased the shares on January 2, 1998, three months before the marriage.

Swanson controverted Strenk's claim that he owned the stock prior to marriage. She asserted that Nasta conspired with Strenk to defeat her community interest in the stock. She testified that after Strenk told her he wanted a divorce, she went to MicroAssist's office and asked Nasta for business documents, which he refused to give her. Swanson asserted that Strenk and Nasta then manufactured a paper trail that purported to show that Strenk acquired his interest in the MicroAssist shares prior to marriage. In addition, on July 9, 1999, three days before Swanson filed for divorce, Strenk sold the shares back to Nasta for $15,000, even though they had generated income of more

---

[2] The temporary orders contained these specific temporary injunctions against Strenk:

IT IS ORDERED THAT Respondent [Strenk] is specifically enjoined from:

Drinking alcoholic beverages while in possession of the subject child.
Drinking alcoholic beverages eight (8) hours prior to any period of possession with the subject child.

than $146,000 in 1999. Swanson alleged that Strenk had committed waste by selling the shares, the reasonable value of which greatly exceeded the sale price, thereby depriving the community of a valuable asset. Swanson also asserted breach of fiduciary duty and constructive fraud.

The trial court found that the MicroAssist stock was a community asset and that the reasonable value of the shares was $168,000; the court then awarded a money judgment for one half of that value to Swanson, as part of the division of the community assets. The court also found that Strenk defrauded the community estate by selling the stock to defeat the community's interest. The court found that $8000 in MicroAssist retirement benefits and $11,000 of bonus money, which Strenk refused during the marriage, were community assets. The court also determined that the community was entitled to reimbursement in the amount of $9,000 for the use of community funds to pay off the debt on Strenk's separate property. Accordingly, the court added one-half of the value of each amount restored to the community estate to the judgment in favor of Swanson. In total, the court ordered that Swanson recover a money judgment from Strenk in the amount of $98,000.

In addition, the trial court appointed Strenk and Swanson as joint managing conservators of their young daughter. Each side presented psychologists to testify regarding possession. Swanson was given the right to determine the primary residence of the child. The trial court ordered two visitation schedules. The first schedule governs possession until the child is three years old. The second takes effect after the age of three. Strenk's access to the child deviates from the standard possession order until the child is seven years old. *See* Tex. Fam. Code Ann. § 153.254(b) (West 1996).

Strenk raises nine issues in which he challenges the court's rulings regarding the classification of property and the distribution of the community estate, its admission or refusal to admit evidence because of alleged discovery sanctions, the court's failure to restrict the geographic area of their daughter's residence as Strenk requested, and the possession schedules.

## CLASSIFICATION OF PROPERTY

*Standard of Review*

Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. *Austin v. Austin*, 619 S.W.2d 290, 292 (Tex. Civ. App.—Austin 1981, no writ). The party asserting otherwise carries the burden of overcoming the community property presumption by clear and convincing evidence. Tex. Fam. Code Ann. § 3.003 (West 1998); *Smith v. Smith*, 22 S.W.3d 140, 144 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code Ann. § 101.007 (West 1996). We review the trial court's findings on characterization of property under a factual sufficiency standard in light of the proponent's burden of proof at trial. *See Leal v. Texas Department of Prot. & Reg. Serv.*, 25 S.W.3d 315, 320 (Tex. App.—Austin 2000, no pet.). In reviewing a decision for factual sufficiency, we examine all the evidence in the record. *Old Kent Leasing Serv. Corp. v. McEwan*, 38 S.W.3d 220, 225 (Tex. App.—Houston [14th Dist.] 2001, no pet.). "We may reverse the trial court's decision for factual insufficiency where that decision is 'so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust.'" *Id.*

4

***MicroAssist Stock***

In his first issue, Strenk complains that the trial court erred in classifying 538 shares of MicroAssist as community property. Strenk insists that he purchased the stock on credit before marriage and that this makes it his separate property based on the inception of title rule. Swanson argues that Strenk and his employer fraudulently created documentation of this earlier purchase after the fact to deprive the community of its principal asset and that their suspicious paper trail failed to defeat the community property presumption by clear and convincing evidence.

To prove that he purchased the stock in January 1998, before his marriage in April, Strenk argues that he received dividend income in the year 1999 in the amount of $146,733, which was based on his having a 35% ownership interest for 363 days in 1998. Swanson does not dispute that they received $146,733 in income in 1999; she contends, however, that Strenk has not proven that the income was *dividend* income based on his ownership of shares for 363 days in 1998. As proof of his purchase date, Strenk offered MicroAssist's 1998 tax return, a Buy-Sell Agreement, and corporate minutes that purport to memorialize Strenk's purchase of stock from MicroAsist in January 1998.

First, Strenk introduced a document that purports to be the 1998 corporate tax return of MicroAssist with an attached "Schedule K-1 ("Shareholders' Shares of Income, Credit, Deductions, etc."). As a subchapter S corporation, MicroAssist distributes its profits or losses to shareholders. The Schedule K-1 reflects Strenk's ownership interest as 34.884700% (a 35% interest, weighted to reflect that he owned the stock for 363 out of 365 days) and ordinary income to him of $146,733. The document is consistent with Strenk's contention that the income the couple received

5

in 1999 was, in fact, dividend income for stock he owned throughout 1998. As Swanson pointed out at trial, however, the 1998 corporate tax return is not signed or dated and it does not appear to have been filed. The only filed document Strenk offered was an application for automatic extension of time to file the return, which bears a date of March 3, 1999. The filed return was never presented.

Second, Strenk relies on a document titled "MicroAssist, Inc. Buy-Sell Agreement." This agreement, which states that its purpose is to provide continuity of the corporation's current ownership and to impose restrictions and obligations on the stock, is dated January 2, 1998. The document, however, was not notarized, and Nasta admitted on cross-examination that he had no independent recollection of when the document was created or executed. Moreover, the corporation did not pay any attorney's fees in 1998, even though the agreement is a sophisticated legal document. Nasta testified that he did not remember whether he paid his attorney, Kelinske, for drafting any documents in 1998, but attributed this fact to the "unique relationship" that existed between him and his attorney and the attorney's "untraditional" billing practices. In addition, Swanson's signature does not appear on the agreement, even though it expressly requires the consent and signature of each shareholder's spouse. Swanson alleges that the document was created after divorce proceedings commenced and back-dated as part of the fraudulent paper trail.

Third, Strenk relies on corporate minutes that purportedly reflect the issuance of stock to Strenk "effective" January 2, 1998. Again, at trial, Swanson identified several suspicious circumstances concerning the minutes. First, these minutes of a "Special Shareholders Meeting" held on January 2, 1998 are signed by Nasta but are not dated. Moreover, on cross examination, Nasta admitted that he did not have an independent recollection of when the minutes were executed. He

6

also conceded that these minutes are the *only* minutes that the corporation had ever executed after the organizational minutes in 1996.

As Swanson pointed out to the trial court, MicroAssist's bylaws prohibit the sale of shares on credit. Nasta testified, however, that the corporation issued 538 shares to Strenk in exchange for his promissory note; the minutes also reflect that Strenk purchased the shares for credit. While the bylaws state that they may be amended by MicroAssist's shareholders at a meeting noticed and called for that purpose, Nasta conceded that the minutes did not reflect any notice or action regarding the amendment of the bylaws. Moreover, Strenk did not produce a promissory note or any evidence of indebtedness given for his "credit purchase" of the stock in January 1998.

Swanson contradicted Strenk's claim that he owned the shares as his separate property before marriage. She testified that after Strenk paid for the stock in 1999, he told her "you own another company." This announcement that Swanson jointly owned the stock was adverse to Strenk's later contention that the shares were his separate property.

The trial court, as the sole fact-finder, was in a position to evaluate the weight and credibility of the witnesses and the evidence. In light of the allegations of fraud on the community and the close friendship between Strenk and the only other shareholder, the court may well have considered the unexplained circumstances concerning the execution and drafting of the documents and the unsigned tax return on which Strenk relied. The judge could have evaluated the weight to be given Strenk's documentary evidence in light of the testimony and demeanor of Nasta, who had difficulty remembering significant corporate events that occurred in his own company, for example, how much his company distributed to him as a dividend, whether he paid an attorney to draft legal

7

documents signed in 1998, and when the minutes of this "special meeting" were drafted and signed. Moreover, the dubious nature of Strenk's evidence tended to support Swanson's theory at trial, which was that Strenk and Nasta manufactured a paper trail to defeat her community interest in the MicroAssist stock.

Strenk contends that the testimony of Swanson's own witness, Steve Peña, provides the clear and convincing proof needed to establish the separate character of the stock. Peña, a certified public accountant for over twenty-five years, testified as to the value of the shares when Strenk sold them back to MicroAssist. Peña stated that he formulated his opinion as to valuation after studying various documents, including the unsigned and undated corporate tax return for 1998.

First, Strenk attempts to establish the validity of the 1998 tax return by referring to Peña's testimony that he assumed the documents he had been provided were valid. Peña's testimony on cross-examination reflected this assumption. Strenk asked whether Peña had any reason to believe that the tax return had been falsified. Peña's response that he did not have any such reason does not establish the validity or the finality of the unsigned, undated, and unfiled corporate tax return. Peña's testimony reflects that in reaching his opinions as to valuation, he assumed that the document was what it purported to be. Strenk incorrectly suggests that Swanson failed to object to the validity of the corporate tax return; Swanson questioned Peña on redirect regarding the lack of a signature and date on the tax return. Peña specifically stated that he had no way of knowing when the return had been prepared or filed.

Second, Strenk contends that Peña's testimony alone is clear and convincing proof that he owned the shares before marriage. Again, Peña's testimony was conditioned on the

8

"assumption" that the tax return was valid and final. Peña testified that Strenk appeared to have a minority ownership interest in 1998 based on the 1998 tax return's K-1. Strenk complains that the court accepted the valuation evidence based on the 1998 corporate tax return but found it insufficient to establish January 1998 as the date of his purchase of the shares.

Swanson responds that Strenk had the burden of proving the latter issue by clear and convincing proof. She also argues that Strenk's narrow focus on the tax return suggests that Peña based his valuation testimony solely on the 1998 tax return. Peña testified, however, that he formulated his opinion regarding the value of the shares by analyzing several documents, including the corporate tax returns for 1997, 1998 and 1999; unaudited financial statements for the latter half of 1997, 1998 and 1999 from MicroAssist's accountant; the corporation's general ledger (the corporation's books) for 1998 and 1999; the buy-sell agreement; and other corporate documents. Peña's testimony regarding the tax return, therefore, does nothing to overcome the suspicious nature of the other documents relied on to establish January 1998 as the date of purchase. As Swanson suggests, the fact that Strenk and Nasta may have had a motivation to falsify the date of Strenk's purchase does not imply that they also had a motivation to misrepresent the corporation's ability to generate profits in its corporate tax return.

Strenk's attempt to use Peña's testimony to establish the separate nature of the MicroAssist stock is unavailing. It has long been the rule of this state that opinion testimony does not establish any material fact as a matter of law. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Peña's opinion testimony, therefore, does not constitute clear and convincing evidence

9

of Strenk's separate ownership sufficient to overcome the presumption that the stock was a community asset.

Strenk had the burden to prove by clear and convincing evidence that the stock was acquired before his marriage. He attempted to do so by establishing that he received dividends in 1999 based on his ownership of the stock throughout 1998, not just after he married in April 1998. The record is factually sufficient to sustain the court's finding that Strenk did not meet his burden by clear and convincing evidence.

***Valuation of MicroAssist Stock***

Strenk also argues that the court erred by valuing the 538 shares at $168,000 because that amount does not reflect the stock's fair market value. If the trial court made an error in the valuation of the stock, "the judgment will not be reversed unless from the evidence as a whole it can be demonstrated that the trial court has abused its discretion in its conclusion that the property has been divided in a manner that is just and fair." *Wallace v. Wallace*, 623 S.W.2d 723, 726 (Tex. Civ. App. —Houston [1st Dist.] 1981, writ dism'd).

Swanson's expert, Peña, testified as to the stock's "book value"; he did not calculate its fair market value. Strenk objected to the evidence of book value and questioned Peña regarding his failure to analyze the stock's fair market value. Strenk cites authority for the proposition that the value of an asset is its fair market value. *See City of Pearland v. Alexander*, 483 S.W.2d 244 (Tex. 1972)*; Wendlandt v. Wendlandt*, 596 S.W.2d 323 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ). Neither case holds that fair market value is the only basis for valuing a closely held stock;

10

indeed, *City of Pearland* involved the narrow question of valuation damages for severed property in an eminent domain proceeding. *See City of Pearland*, 483 S.W.2d at 245-46.

Strenk himself failed to present any evidence of the stock's fair market value. He attempted to undermine Peña's methodology but did not present any controverting evidence of the stock's value. Therefore, we hold that the court did not abuse its discretion in placing a value of $168,000 on the 538 shares.

***Remaining Issues Concerning the $98,000 Money Judgment Reimbursement***

Strenk argues that the court's findings regarding the remaining components of the money judgment are not supported by the record. Strenk first challenges the court's finding that the community was entitled to reimbursement in the amount of $9,000 for the use of community funds to pay off the debt on Strenk's separate property vehicle.[3] The court specifically found that the $9000 expenditure greatly exceeded any benefit received by the community estate; Strenk asserts, however, that the court failed to consider the offsetting benefits received by the community.

The use of one estate's assets to complete the purchase of another estate's property or to otherwise benefit the other estate may give rise to a claim of reimbursement by the contributing

---

[3] The trial court made the following findings of fact regarding reimbursement:

(1) The community estate paid $9000 to reduce Joachim Strenk's separate estate debt on Joachim Strenk's separate property Isuzu Rodeo.
(2) Such $9000 expenditure greatly exceeded any benefit received by the community estate.
(3) Such $9000 expenditure enhanced the value of Joachim Strenk's separate estate and such enhanced value greatly exceeded any benefit received by the community estate.
(4) Joachim Strenk's separate estate was unjustly enriched by such $9000 expenditure.

11

estate against the benefitted estate. *Penick v. Penick*, 783 S.W.2d 194, 194-95 (Tex. 1988); *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722-23 (Tex. App.—Austin 1999, no pet.). Reimbursement is an equitable remedy, and the trial court must look at all of the circumstances to determine what is fair, just, and equitable. *Penick*, 783 S.W.2d at 197 (citing 27 Am. Jur. 2d *Equity* § 102 (1966); *see also Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex. 1985). "[R]eimbursement is not merely a balancing of the ledgers between the marital estates," and a trial court's discretion in evaluating a claim for reimbursement is as broad as its discretion "in making a 'just and right' division of the community property." *Penick*, 783 S.W.2d at 198 (citing Tex. Fam. Code Ann. § 3.63 (Vernon Supp. 1988)).

A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When reviewing legal sufficiency, "we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregard any evidence and inferences to the contrary." *Soto v. Sea-Road Int'l., Inc.*, 942 S.W.2d 67, 71 (Tex. App.—Corpus Christi 1997, writ denied) (citation omitted). Under such a point, we are limited to reviewing only the evidence that tends to support the finding. *Id.* If there is any evidence of probative force, that is, more than a scintilla of evidence that supports the finding, we must overrule the point, and uphold the finding. *Id.*

When reviewing a factual sufficiency point, we examine all of the evidence, both the evidence that supports the finding and the evidence that controverts the finding. *Id.* Under this type

12

of point, we can set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*

It is unclear whether Strenk is raising the legal or the factual sufficiency of the evidence to support the court's findings on reimbursement. Under either standard we find the evidence to be sufficient. Strenk does not point to any evidence that he presented of an offsetting benefit to the community; he directs us only to Swanson's testimony regarding her occasional use of the vehicle. Strenk does not explain how such occasional use offsets the benefit to Strenk of having his entire purchase money debt for the vehicle paid in full. The facts and circumstances of this case included evidence of Strenk's dishonesty and deception, which might have inclined the court to grant the equitable remedy of reimbursement. Therefore, we hold that the record supports the trial court's finding.

***Bonus and Retirement Payments Refused by Strenk***

The trial court found that Strenk refused retirement benefits and a bonus in 1999 when the divorce was pending, thereby depriving the community estate of assets to Swanson's detriment.[4]

---

[4] The court made the following findings regarding the retirement payments and the bonus:

(6) Joachim Strenk refused retirement benefits during the pendency of the divorce of the parties, which retirement benefits would have been awarded to him except for his refusal.

(7) In refusing the retirement benefits, Joachim Strenk deprived the community estate of assets to the detriment of Tyra Jean Swanson Strenk—he thereby acted with dishonesty of purpose and with the intent to deceive Tyra Jean Swanson Strenk.

(8) Joachim Strenk refused a bonus during the pendency of the divorce of the parties, which bonus would have been awarded to him except for his refusal.

(9) In refusing the bonus, Joachim Strenk deprived the community estate of assets to the detriment of Tyra Jean Swanson Strenk—he thereby acted with dishonesty of

Strenk asserts that there is no evidence to support the trial court's findings that Strenk refused retirement benefits and a bonus in 1999. We therefore construe his argument as one of legal insufficiency.

Swanson presented evidence that Strenk refused a bonus in 1999. She testified that Strenk received a bonus in 1998 and that she believed he refused his 1999 bonus. Nasta testified that Strenk asked him not to give him a bonus; had it not been for Strenk's request, Nasta would have given Strenk a bonus in 1999. Swanson testified that every other MicroAssist employee received a bonus in 1999, the inference being that Strenk would have received a bonus had he not told Nasta that he did not wish to receive one. Swanson presented evidence that an employee who had worked at MicroAssist for about the same length of time as Strenk received a bonus check for over $11,000 in 1999.

Swanson also presented evidence that Strenk wrongfully refused contributions to his retirement plan. Swanson testified that in 1998 MicroAssist contributed either $7000 or $8000 to Strenk's retirement account; in 1999, however, MicroAssist did not contribute anything to his account. Swanson testified that every other MicroAssist employee received contributions to their retirement accounts in 1999. She testified that she believed that Strenk refused retirement contributions just as he had his 1999 bonus. The court had before it evidence of Strenk's motives to defraud the community and of Strenk and Nasta's cooperation toward that end as facilitated by their friendship and employment relationship. We hold that the record supports the court's findings

---

purpose and with the intent to deceive Tyra Jean Swanson Strenk.

14

that Strenk wrongfully refused retirement benefits and a bonus. We therefore reject his argument. We overrule all the contentions raised in issue one.

### *Leather furniture and Volvo automobile*

In his second issue, Strenk complains that the trial court made material errors regarding the classification of other property. Strenk first argues that a leather chair and ottoman are his separate property because he acquired them before marriage. He also contends that the court erroneously found that a 1990 Volvo was Swanson's separate property. Swanson responds that the trial court found that Strenk failed to meet his burden to establish his claim to the leather chair and ottoman and that she provided clear and convincing proof that the vehicle was her separate property.

### *Leather chair and ottoman*

The trial court did not make a specific award of the leather furniture to Swanson, nor did it make an express ruling on its classification. Rather, the divorce decree awards Swanson the household furniture that was in her possession, which apparently included the leather furniture. The testimony at trial reflects that at the court's direction, the parties had come to an agreement regarding the personal property in their possession. The agreement, which Strenk introduced as Exhibit 32, is a multiple page document that lists various items, including the leather furniture, and purports to identify them as "SP," "CP" or "Tyra's," presumably the parties's stipulations as to the classification or ownership of each item. The leather furniture is not designated "SP" but is marked with a star; there is no explanation of the significance of the star. Strenk's counsel emphasized that the "SP" label indicated the separate property of his client:

15

Yes sir. Just so I can explain it. The separate estate of husband that was listed on our pretrials, has been taken by [Swanson's trial counsel], and where she's written "SP," they've written some other things that would mean it was in contested [sic.] or something like that, and there may not be any evidence on that. So it's . . . community property if there is no evidence on it. *But the SP's are the stipulated separate property of my client*.

. . .

Now, there's some other writing on there *but the only relevant writing is the SP*, and that's what this is being offered for as being the agreement.

As the leather furniture was not designated as Strenk's "SP," Strenk appears to have waived this claim before the trial court. Furthermore, the court's letter ruling to the parties, which informed them that he was granting the divorce and apprised them of his rulings on the main issues, reflects the trial court's understanding that the classification of the parties' personal items, including the leather furniture, would be decided by the parties' agreement: "Regarding the property issues *the parties have indicated that they have or shall divide their personal separate material items and other community material items. The court is to determine the issues of the MicroAssist, Inc. stock and other monetary and real property issues only*." (emphasis added). Thus, the classification of the leather chair and ottoman was not an issue before the court.

On appeal, Strenk focuses on Exhibit 10, a "property notebook" which contains a receipt for leather furniture dated March 7, 1998, a credit card receipt with the same date, and the credit card statement for April. At trial, Strenk briefly testified that the leather chair and ottoman were his separate property; as support he introduced the parties' stipulated agreement which did not label the leather furniture as his "SP." He did not bring to the court's attention the receipts, which were buried among multiple documents in Exhibit 10. From our review of the record, it appears that

Strenk failed to present the issue of classification of the leather furniture to the trial court and failed to rely on the documents he focuses on in this appeal. We hold, therefore, that Strenk has not preserved his claim that the trial court misclassified this item of personal property.

Strenk also complains that Swanson failed to prove by clear and convincing evidence that she owned a 1990 Volvo as her separate property. Swanson testified that she bought the Volvo with separate property funds. Swanson cashed a check she received from the sale of stocks owned before marriage to pay for the Volvo; she never put the money into an account. She also offered the certificate of title in her name as evidence of her ownership of the Volvo. In the absence of controverting testimony, the court did not abuse its discretion in finding that the Volvo was her separate property. Therefore, we overrule the complaints raised in issue two.

## DIVISION OF COMMUNITY ESTATE

*Standard of Review*

In a divorce proceeding, the trial court shall order a division of the estate of the parties in a manner it deems just and right. Tex. Fam. Code Ann. § 7.001 (West 1998); *Robles v. Robles*, 965 S.W.2d 605, 613 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). The trial court exercises wide discretion in the division of marital property and that discretion will not be disturbed on appeal unless it is shown the court has clearly abused its discretion. *Robles*, 965 S.W.2d at 613. In his third issue, Strenk complains the trial court's division of the community estate is so unjust and unfair as to constitute an abuse of discretion. He asserts that the overall division of property awards Swanson 68% of the community assets and awards Strenk only 32%. Swanson rejects Strenk's ratio, asserting that it is based on an incorrect valuation of the underlying assets. Even assuming the correctness of

17

Strenk's characterization, however, Swanson maintains that the record supports the court's disproportionate division.

The Family Code directs a trial court to "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." *Id.* § 7.001. Community property need not be equally divided. *Vandiver v. Vandiver*, 4 S.W.3d 300, 302 (Tex. App.—Corpus Christi 1999, pet. denied). Factors to be considered in dividing the estate include the relative earning capacities and business experience of the spouses, the educational background of the parties, the fault in breaking the marriage, the benefits the innocent spouse would have received had the marriage continued, custody of children and wasting of community assets. *Baccus v. Baccus*, 808 S.W.2d 694, 700 (Tex. App.—Beaumont 1991, no writ); *Oliver v. Oliver*, 741 S.W.2d 225, 228 (Tex. App.—Fort Worth 1987, no writ) (citing *Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1981)). We must presume that the trial court exercised its discretion properly, and we are not to disturb that discretion on appeal unless a clear abuse of discretion has been shown. *Vandiver*, 4 S.W.3d at 302.

Even assuming that Strenk's underlying valuations are correct, based on the record, we cannot hold that the trial court abused its discretion in dividing the community estate. First, Swanson presented evidence of Strenk's act of waste of a community asset by selling the MicroAssist stock before the divorce for $15,000, even though the court found that a reasonable value for the stock was $168,000. Second, the court had before it evidence that Strenk's alcohol use and refusal to get treatment were the primary reasons for the divorce. Third, the court heard testimony that Strenk was violent toward Swanson in the presence of their daughter. Fourth, Swanson filed suit

only after Strenk asked her for a divorce. Fifth, the child's primary residence is with Swanson. In addition, Swanson presented evidence that Strenk committed constructive fraud by selling the stock, as the sale prevented the community from receiving a distribution of profits in 1999. Also before the court were the suspicious documents that Strenk and his employer allegedly created in an attempt to remove from the community estate the single most valuable asset.

The trial court's role is to weigh the evidence, determine credibility, and divide the estate based on the court's findings. *See Murff*, 615 S.W.2d 696 at 700 (observing that the trial court in a divorce case has the opportunity to observe the parties on the witness stand, determine credibility, and evaluate their needs). Wide latitude and discretion rests in the trial court and that discretion should only be disturbed in the case of clear abuse. *Id.* Based on the evidence, we hold that the court did not abuse its discretion in making a disproportionate division of the community estate. We therefore overrule the third issue.[5]

**EVIDENTIARY ISSUES**

*Dr. Yorke's Testimony*

In his fourth issue, appellant contends that the trial court erred by allowing Jane Yorke, a psychologist, to testify as an expert regarding an appropriate visitation schedule for the

---

[5] Strenk also makes an argument concerning a specific aspect of the court's division. He contends that the trial court awarded real estate in Dewitt County to Swanson and ordered Strenk to assume "all [the] debt." Strenk's assertion that the trial court awarded the Dewitt County property to Swanson and ordered Strenk to pay all of the debt is contrary to the express terms of the divorce decree. The decree states that Swanson is to pay "[a]ny and all debts, charges, liabilities, and other obligations incurred solely by the wife from and after July 9th, 1999" and "[a]ll encumbrances, ad valorem taxes, liens, assessments, or other charges due or to become due on the real and personal property awarded to the wife . . . " We therefore reject Strenk's characterization of the court's order.

19

couple's daughter. Strenk argues that Swanson did not provide documentation regarding the substance of Yorke's testimony that he apparently requested in discovery. Swanson contends Strenk failed to identify the specific documents that he requested and did not produce his discovery request to the trial court at the time of his objection to Yorke's testimony.

The inclusion and exclusion of evidence is committed to the trial court's sound discretion. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). In addition, appellate courts ordinarily will not reverse a judgment for erroneous rulings on admissibility of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

At trial, Strenk objected to Yorke's testimony on the basis that he had not been provided with documents on which her opinion was based. Strenk, however, failed to identify the specific documents on which Yorke was relying and which he had allegedly requested; instead he complained to the court that her "file" had not been provided to him in discovery. In addition, he did not present the trial court with his discovery requests.

Strenk cites as support for his argument *Varner v. Howe*, 860 S.W.2d 458 (Tex. App.—El Paso 1993, no writ). In *Varner*, the appellant complained that the trial court erred in allowing an attorney to testify as to attorney's fees because he had failed to furnish requested documents. *Id.* at 463. The court construed former rule 215(5) (now rule 193.6) as follows: "In contrast, unless good cause is shown, the court has no discretion in applying the automatic sanction of Tex. R. Civ. P. 215(5) to *specific witnesses unidentified* in response to interrogatories and to unfurnished *specially requested* documents and tangible things." *Id.* at 464 (emphasis added). As

20

discussed, Strenk failed to identify specifically requested documents. Moreover, the documents were not offered as evidence by Swanson; rather, the documents formed the basis of Yorke's testimony. In addition, Strenk does not argue that Yorke was not a designated or identified witness. Therefore, his reliance on *Varner* is misplaced. Finally, the request for disclosure and request for production were never provided to the trial court and are not part of the appellate record. Accordingly, we overrule appellant's fourth issue.

### *Documents Relating to MicroAssist Stock*

In his fifth issue, Strenk contends that the trial court erred in excluding Respondent's Exhibit 9, which consists of certain documents pertinent to his claim that he purchased his MicroAssist shares before marriage. Swanson contends Strenk failed to preserve error on this issue because he did not explain the purpose or relevance of the evidence to the trial court. The record indicates that, contrary to Swanson's contention, Strenk explained the relevance of the exhibit to the trial court. We must then determine whether the trial court abused its discretion by excluding the evidence.

The penalty under rule 193.6 for a party's failure to respond to a discovery request is mandatory exclusion of the unidentified witness or evidence sought. Tex. R. Civ. P. 193.6. Therefore, a party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce into evidence material or information that was not timely disclosed, or offer the testimony of a witness who was not timely identified, unless the court finds good cause or that the failure will not unfairly surprise or unfairly prejudice the other parties. *Id.* Strenk did not deliver the

documents 30 days prior to trial. *See* Tex. R. Civ. P. 190.3. Therefore, the penalty of exclusion under rule 193.6 automatically applies. Tex. R. Civ. P. 193.6.

The burden of establishing good cause is on the party seeking to introduce the evidence. *Id.; Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex. 1992) (explaining that counsel should not be excused from the requirements of the rule without a strict showing of good cause).[6] The good cause exception permits a trial court to excuse a failure to comply with discovery in difficult or impossible circumstances. *Alvarado*, 830 S.W.2d at 915. The following factors standing alone do not constitute good cause: inadvertence of counsel, lack of surprise, and uniqueness of the excluded evidence. *Id.* In addition, determination of good cause is within the discretion of the trial court, and the determination can only be set aside if that discretion was abused. *Morrow v. HEB, Inc.*, 714 S.W.2d 297, 298 (Tex. 1986).

Strenk argues that the documents should have been admitted because they would not have taken Swanson by surprise. As noted, lack of surprise standing by itself is not sufficient to show good cause. *See Alvarado*, 830 S.W.2d at 915. Strenk offers as additional reasons the facts that the documents were in Nasta's sole control, Strenk was not aware of the existence of the documents, and

---

[6] The *Alvarado* court discussed former rule 215(5) of the rules of civil procedure, which has been superceded by rule 193.6. *See* Tex. R. Civ. P. 215(5) (1998) (superceded 1999). The substance of "new" rule 193.6 is essentially the same as former rule 215(5), which was analyzed in *Alvarado*; the new rule, however, provides a second exception to the mandatory exclusion rule. *See* Tex. R. Civ. P. 193.6 (stating that a party may avoid the mandatory exclusion if he shows that his failure to comply with the discovery request 30 days before trial will not unfairly surprise or prejudice the other party). *Alvarado*'s analysis of the good cause provision is still relevant given that the change to the rule retains the substance discussed in that opinion. Moreover, Strenk argues under this provision only and does not argue that his failure to supplement the discovery request would not have unfairly surprised Swanson at trial.

22

the documents were only discovered two weeks before trial. These reasons may be viewed in light of the alleged collusion between Strenk and Nasta. We hold that Strenk did not meet his burden to show good cause and the trial court did not abuse its discretion by excluding the documents. Strenk's fifth issue is overruled.

## RESIDENCE AND POSSESSION OF CHILD

Strenk brings four complaints dealing with where his daughter may live and when he may see her. The trial court appointed the parents joint managing conservators but granted Swanson the right to establish the child's primary residence in Williamson, Travis or Montgomery counties. Strenk had asked the court to restrict his daughter's primary residence to Williamson or Travis counties, as it had done while the divorce was pending. Strenk now complains that the court expanded that geographic area to include Montgomery County, where Swanson has family and owns a home. Having allowed Swanson to move to Montgomery County, the court imposed possession orders that reflected the travel distance between Montgomery County and Williamson County, the young age of the child, and the evidence of Strenk's alcohol abuse and violence. One possession order governs visitation until the child attains the age of three; the other governs visitation after the child's third birthday.

The standard of review governing orders of conservatorship and possession is abuse of discretion. *See G.K. v. K.A.*, 936 S.W.2d 70, 72 (Tex. App.—Austin 1996, writ denied). In determining whether a trial court abused its discretion, we ask "whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Wood v. O'Donnell*, 894 S.W.2d 555, 557 (Tex. App.—Fort Worth 1995, no writ)

23

(citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)).[7] An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *Wood*, 894 S.W.2d at 557. Furthermore, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id*.

In his ninth issue, Strenk attacks the trial court's failure to limit the child's primary residence to Williamson or Travis counties. Because many of Strenk's complaints about the visitation schedule flow from the circumstance that Swanson and the child were allowed to reside in Montgomery County, we will address this issue first.

***Child's Primary Residence***

In his ninth issue, Strenk contends that the court erred by allowing Swanson to establish the child's primary residence in Montgomery County. Once a court has appointed a joint managing conservator, the court shall designate which parent has the exclusive right to determine the primary residence of the child and shall establish a geographic area where the child may reside *or* specify that the conservator may determine the child's residence without regard to geographic location. Tex. Fam. Code Ann. § 153.134 (West Supp. 2001). Strenk contends that the court's geographical restriction violates subsection 153.134(b)(1)(A) which provides that the trial court may

---

[7] Strenk and Swanson agree that Section 153.002 of the Texas Family Code provides the paramount guiding principle for this case. Section 153.002 states, "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002 (West 1996).

establish, until modified by further order, a geographic area consisting of the county in which the child is to reside and any contiguous county thereto within which the conservator shall maintain the child's primary residence;

*Id.* § 153.134(b)(1)(A).

Strenk argues that the trial court's order violates this section because Montgomery County is not contiguous to Travis or Williamson County. Strenk ignores the rest of the statute which gives the court the option to

specify that the conservator may determine the child's primary residence *without regard to geographic location*[.]

*Id*. § 153.134(b)(1)(B) (emphasis added). Because the trial court is not required to designate *any* geographic restrictions on where the parent and the child may reside, the court does not abuse its discretion by naming three counties where the primary residence may be established, even though one of those counties is not contiguous to the other two.[8]

Strenk's contention under this issue is really the same argument he makes under issues six and seven, that the court abused its discretion by not continuing in the final divorce decree the court's temporary orders requiring Swanson to maintain the child's primary residence in Travis or Williamson counties while the divorce was pending. Swanson asked the court to allow her to move to Montgomery County after the divorce was final so she could live near family and in a home that she had owned prior to marriage.

---

[8] Contrary to appellant's reading of section 153.134(b)(1)(A), we interpret this section to say that if the court wishes to restrict a child's primary residence to a named county, it must allow some flexibility by expanding that restriction to also include a county contiguous to the named county.

25

Swanson testified that she had purchased a home and lived in Conroe from 1989 until she married Strenk, except for a brief period when she lived in San Antonio. She stated that if she lived in Conroe, she would be able to stay home to care for their daughter. She also testified that she had friends and family in the area who would be able to assist her in caring for the needs of the child. This is sufficient evidence to support the trial court's inherent finding that allowing mother and child to move to Conroe would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 153.002 (West 1996) (stating that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child"). We hold that the court did not abuse its discretion in allowing the child to reside in Montgomery County, rather than restricting her residence to Williamson or Travis counties as Strenk requested. We overrule the ninth issue.

*Possession Schedules*

In his sixth and seventh issues, Strenk complains that the trial court abused its discretion when it entered a possession schedule for the child before her third birthday that deviates from the court's findings, and a possession schedule for the child after her third birthday that substantially deviates from the guiding rules and principles provided by the Texas Family Code. Strenk specifically complains that the findings of fact explaining the deviation are not supported by evidence and do not bear a rational relationship to the possession schedules entered by the trial court. We will examine these findings in turn.

First, the court found that the child was under the age of three and that a standard possession order was not appropriate. The Family Code provides that when a child is under the age

26

of three, "the court shall render an order appropriate under the circumstances." *Id*. § 153.254(a). The trial court's possession order provides that while the child is under the age of three, there will be no overnight possession, and Strenk must travel to the community where the child resides to see her. Given the child's age, the distance between the parents' residences, and the later findings concerning alcohol and violence, we find these restrictions are "appropriate under the circumstances."

After the child reaches the age of three, the court must prescribe a possession order, presumptively the standard order of possession. *Id*. § 153.254(b). Here, the standard order is not followed. After the age of three and before the child attains the age of seven, the trial court's possession order provides for overnight visitation on the first, third and fifth Saturday of each month. Christmas visitation must still be exercised in the child's community. After the child turns six, the court's possession order provides for additional holiday visitation on the child's birthday, Thanksgiving, Christmas holidays, and during the summer. After the child reaches age seven, the standard possession order takes effect.

To justify this deviation from the standard order of possession until the child attains the age of seven, the Court entered the following additional findings: "A possession schedule which requires weekly travel between Montgomery County and Williamson County would be detrimental to the child," and "[a] possession schedule which allows the child contact with her non-custodial parent, in her community of residence, is in the best interest of the child, even after the child reaches the age of three because the child is not old enough to understand the need for travel for the purposes of visitation."

More importantly, the court addressed concerns about Strenk's alcohol abuse related to possession of the child as a reason for deviating from the standard possession order: "Nonstandard visitation is also appropriate because respondent has used alcohol either prior to his possession of the child or during the possession of the child despite a court order to the contrary." Finally, the court found there was evidence that Strenk had been violent toward Swanson in the presence of the child and that this warranted limited visitation, away from the residence of the parties: "Additionally, the child has been a witness to violence by Respondent toward Petitioner and any continued incidents of violence of that kind are not in the child's best interest, therefore, all visitation exchanges should be in a public place and not at the residence of the parties and visitation should be limited due to the violence by Respondent toward Petitioner."

When the court deviates from the standard possession order, the trial court must, upon request, enter specific findings of fact explaining its reasons. *Id*. § 153.258. The essence of Strenk's complaint is that the evidence does not support these findings. He relies especially on the testimony of Dr. Susan McMillan, a psychologist who offered testimony that more visitation would benefit the child. Although the court has greatly restricted Strenk's access to the child until she is three, and taken four years to transition from the visitation appropriate under the age of three to the standard possession order, we hold that there is sufficient evidence to support the findings that explain why the court has deviated from the standard order of possession until the child turns seven.

First, Dr. McMillan testified about what visitation would best serve a hypothetical child and a hypothetical parent: she had never visited with Strenk, Swanson or their child. On cross-examination, Dr. McMillan admitted that she had no knowledge of Strenk's alcohol use or his

28

violation of a court order not to drink in the child's presence. The trial court was presented with substantial evidence of Strenk's abuse of alcohol, of the problems it presented in the marriage, of his desire to seek a divorce rather than to seek treatment, and of his inability to conform to a court order not to drink during periods of possession. We hold that these specific circumstances of these specific individuals may be considered by the court in restricting visitation, even though theoretically more contact between parent and child would be beneficial.

Strenk contends that the restrictive visitation schedule punishes him without any evidence that his consumption of alcohol harmed his child. The record, however, indicates that Strenk frequently abused alcohol and that he violated a court order prohibiting consumption of alcohol during periods of possession. Strenk suggests that if the trial court believed his alcohol consumption created problems, then the trial court should have ordered him to attend counseling rather than "punish" him with a restrictive visitation schedule. The trial court may have recognized the futility of ordering someone to seek treatment for substance abuse. Nothing in the court's order prevents Strenk from seeking treatment on his own or from seeking a modification of this "restrictive" possession schedule if he removes the dangers, including the danger of violence associated with his consumption of alcohol. But at this time, the evidence of alcohol abuse and of violence associated with his drinking, the known dangers associated with alcohol and driving, and the distance between the parties' residences all support the trial court's conclusion that it was in this young child's best interest to deviate from the standard possession order until the age of seven. We overrule Strenk's sixth and seventh issues.

**MOTION FOR NEW TRIAL**

Finally, Strenk argues that the trial court abused its discretion by denying his motion for a new trial. Strenk claims that he presented new evidence that the possession schedule entered by the trial court was detrimental to the child and that a new trial would result in a different outcome.

Strenk contends that the offered testimony of Dr. McMillan presented new evidence that the possession schedule ordered by the judge would be damaging and shocking to a child of this tender age. Dr. McMillan admitted, however, that she had no "new evidence" to offer to the court.

> Counsel for Swanson: So the only thing that's new at all is the judge's ruling. There's no new evidence that you have independent of the judge's ruling?
>
> McMillan: That's correct.

Strenk admits that Dr. McMillan's testimony at the hearing on the motion for new trial would have been consistent with her testimony at trial. This admission underscores the fact that Dr. McMillan's testimony would not constitute new evidence.

Strenk contends that he need not show newly discovered evidence to obtain a new trial in a matter involving child custody, relying on *In re C.B.M.*, 14 S.W.3d 855, 861 (Tex. App.—Beaumont 2000, no pet.). In that case, the court acknowledged one prior decision supporting Strenk's proposition, but held that any such exception would be limited to "extreme" cases where the evidence is sufficiently strong to show a seriously adverse effect on the child and where presentation of such evidence would probably change the result. *See id.* at 861 (citing *C. v. C.*, 534 S.W.2d 359, 361-62 (Tex. Civ. App.—Dallas 1976, writ dism'd)). There is no abuse of discretion in the trial

court's failure to admit evidence at the hearing on the motion for new trial that is merely cumulative of the evidence offered at trial and which would not probably change the result. *C.B.M.*, 14 S.W.3d at 861. Moreover, Dr. McMillan's offer of proof at the hearing on the motion for new trial was based again on the "average" or hypothetical child of this age; she did not offer evidence specifically concerning any "seriously adverse effect on the interest and welfare" of this child in these circumstances. We hold that the trial court did not abuse its discretion in overruling Strenk's motion for new trial and overrule the eighth issue.

## CONCLUSION

Having overruled all of Strenk's issues on appeal, we affirm the judgment of the trial court in all respects.

_____

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: November 8, 2001

Do Not Publish